IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 18, 2017 Session

## STATE OF TENNESSEE v. CHRISTOPHER TERRELL SHIPP

**Appeal from the Criminal Court for Davidson County**
**No. 2013-C-2700    Seth W. Norman, Judge**

_____

**No. M2016-01397-CCA-R3-CD**

_____

The Defendant, Christopher Terrell Shipp, was convicted by a jury of one count of criminally negligent homicide, one count of felony murder, two counts of attempted aggravated robbery, and one count of attempted second degree murder, and he received an aggregate sentence of life in prison. The surviving victim of the crimes identified the Defendant as the perpetrator during her testimony at the preliminary hearing, but she died of natural causes prior to trial. The recorded testimony from the preliminary hearing was used to establish the identity of the Defendant at trial. The Defendant appeals his convictions, arguing that the evidence was insufficient to uphold the verdicts and that the victim's testimony was admitted in error because at the time of the preliminary hearing, he had not had access to a police report which could have impeached her testimony. After a thorough review of the record, we conclude that the evidence is sufficient to uphold the verdicts and that the testimony was properly admitted, and we affirm the trial court's judgments. We remand for merger of the criminally negligent homicide conviction into the felony murder conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed; Case Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Manuel B. Russ (on appeal), and David Harris and Ron Munkeboe (at trial), Nashville, Tennessee, for the appellant, Christopher Terrell Shipp.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Glenn Funk, District Attorney General; and Dan Hamm and Paul DeWitt, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Defendant was charged with first degree premeditated murder, first degree felony murder, two counts of attempted aggravated robbery, and attempted first degree murder for his role in the shootings of Mr. Dwight Bond, who died as a result of his injuries, and Mr. Bond's girlfriend, Ms. Wendy Goodrich. Ms. Goodrich survived the attack and identified the Defendant as the attacker to law enforcement, in a photographic lineup, and at the preliminary hearing, but she died prior to trial.

The defense moved to exclude Ms. Goodrich's prior testimony, arguing that its admission would violate the rules excluding hearsay and the Confrontation Clause of the United States and Tennessee Constitutions. In particular, the defense objected to the admission of the testimony on the basis that Ms. Goodrich had made a statement to a law enforcement officer that the Defendant had a facial tattoo and that this information had not been available to defense counsel at the preliminary hearing. The Defendant argued that he was not able to effectively cross-examine the witness without her prior statement to law enforcement. The trial court found that the witness was unavailable and that her previous testimony was admissible.

At trial, Ms. Goodrich's mother, Ms. Margaret Hatfield, testified that at the time of the shootings, she lived with Ms. Goodrich and Mr. Bond. A diagram of the home introduced at trial showed that the home had a small porch with a front door leading to the living room. The living room was connected with the first bedroom by a door, and the first bedroom served as a conduit to the second bedroom, which was connected to the kitchen and bath. Ms. Hatfield was in the second bedroom at around 10:00 or 10:30 p.m., when she heard gunfire. More shots were fired, and she heard her daughter ask "Chris" why he was going to shoot her. Ms. Hatfield stated, "All he kept saying was, '[W]here's the money?'" She had seen the Defendant once on a prior occasion and knew him as "Chris" but did not see him during the crimes and could not identify his voice. She did not know if there was an accomplice in the house. Ms. Hatfield remained in the second bedroom until her daughter "fell through the bedroom door," with gunshot wounds in the chest and hand. Ms. Hatfield called 9-1-1 and assisted her daughter to the front porch. Mr. Bond was positioned behind the front door, leaning over and apparently deceased. Ms. Hatfield acknowledged that she had become aware in January that Mr. Bond was selling drugs from the home but denied that numerous strangers frequented the home in search of drugs and was not aware of any drug-related debts owed by Mr. Bond.

Ms. Hatfield testified that her daughter died on February 4, 2015. An autopsy introduced into evidence showed that the cause of death was hypertensive cardiovascular disease. Ms. Hatfield authenticated an audio recording of her daughter's prior testimony from the July 11, 2013, preliminary hearing.

At the preliminary hearing, Ms. Goodrich testified that prior to the shooting, she knew the Defendant as "Chris" and had seen him "nightly" because he bought marijuana from Mr. Bond. She had known him for a year or longer. On the evening of January 25, 2013, Mr. Bond was in the living room, and Ms. Goodrich had gone into the home's first bedroom, closing the door so that she could watch television. Between 10:15 and 10:30 p.m., she heard a sound like firecrackers, heard Mr. Bond say, "[O]h, sh*t," and then heard another "popping" sound. By the time she got off the bed, the Defendant was in the bedroom, at the edge of her dresser, with a gun pointed to her chest. He was not wearing a mask or gloves. Ms. Goodrich testified that she was familiar with firearms and that the Defendant was holding a black revolver. The Defendant demanded money, and Ms. Goodrich tried to explain that there was not any money in the house, pulling out the dresser drawers to demonstrate there was nothing of value. She then felt a "heat go through" her chest and was knocked through the bedroom door. She felt a second heat in her hand. Ms. Goodrich fell to the floor and looked through the door to the living room, where she could see another intruder, whom she described as "a tall figure." She was not able to give any identifying information about this second person. Ms. Goodrich lay still and held her breath so that the Defendant would think she was dead.

Ms. Goodrich testified that the Defendant took some marijuana from the living room and "a little money" from Mr. Bond's pocket. Ms. Goodrich stated that Mr. Bond had two ounces of marijuana prior to the shootings but that the police only found one ounce. His identification and cellular telephone were missing. Ms. Goodrich suffered a gunshot wound on the left side of her chest which broke two ribs and bruised her lung. She lost the tip of her index finger as a result of the gunshot wound in her hand. Ms. Goodrich was able to pick the Defendant out of a photographic lineup and testified that she had no doubt he was the shooter. She was not able to identify the second person who was in the home.

Officer Rodney Clark, a patrol officer with the Metropolitan Nashville Police Department, testified that he was the first to arrive at the home. When he asked Ms. Goodrich who shot her, she said, "A guy named Chris." Officer Warren Fleak from the Identification Unit assisted in documenting the crime scene. He found one cartridge casing toward the rear of the seat cushion of a chair in the living room and two more casings on the floor behind the chair. Digital scales and a plastic bag of marijuana were also found in the living room. A fragmented bullet was recovered from a heater in the second bedroom. A second bullet was recovered from behind a dresser, near a pool of

blood. Officer Fleak acknowledged that no samples of blood were taken for DNA testing, although blood was present on the porch, in the living room, and in both bedrooms.

Detective Lindsey Farnow-Smith spoke with Ms. Goodrich at the hospital. Ms. Goodrich told Detective Farnow-Smith that she had heard a knock and had heard "Chris" say, "Where's the money? Where's the money?" The Defendant then told someone to "get the weed." Ms. Goodrich stated that she heard shots and that the Defendant then confronted her with a revolver and shot her. She told Detective Farnow-Smith that the Defendant was familiar to her because he had frequented the house to get haircuts. She gave a description of the Defendant. In her description, Ms. Goodrich stated that the Defendant had a facial tattoo. She could not describe the tattoo. Detective Farnow-Smith acknowledged that the Defendant, who was present in the courtroom, did not have a facial tattoo. She testified that he had a discoloration which she described as "shadowing close to his cheek bones and facial hair."

Detective Andrew Davis investigated the crime and developed the Defendant as a suspect on January 27, 2013. He acknowledged that Ms. Goodrich only knew the Defendant as "Chris" and that Mr. Bond's family had told him that the Defendant's name was "something like Chris Graves." He also acknowledged that he investigated the name "Chris Grady." Detective Davis explained that Mr. Bond's family had initially given the Defendant's last name as possibly "Graves" and later corrected it to "Grady." The Defendant's relatives bore the last name "Grady."

Detective Davis testified that Ms. Goodrich was able to identify the Defendant from a photographic lineup. He acknowledged that he did not include any men with facial tattoos in the lineup. He also agreed that the Defendant did not have a facial tattoo.

Law enforcement tried to locate the Defendant at multiple dwellings and spoke with members of the Defendant's family to alert the family that they wished to question the Defendant. The Defendant was arrested over five months later, in the company of a woman who was aware that police were seeking him in connection with the crimes.

Detective Davis acknowledged that the casings and bullet fragments were not matched to any weapon, noting that no weapon was recovered in the case. Detective Davis testified that a semi-automatic gun would eject cartridge casings such as those recovered from the living room but that a revolver would not eject cartridges. He testified that because no casings were recovered in the bedroom, the inference could be made that Ms. Goodrich was shot with a revolver. The fingerprints recovered from the scene were of too poor a quality to be useful. He acknowledged that the blood from the scene was not analyzed but testified that there was no indication of a struggle or evidence

that either of the perpetrators would have left blood or DNA evidence behind. Detective Davis acknowledged that no physical evidence linked the Defendant to the crimes.

Dr. Erin Carney testified that the Medical Examiner's Office had determined that Mr. Bond died of multiple gunshot wounds. One gunshot entered his thigh and broke his femur. Another shot entered his back right shoulder and exited his upper back. Mr. Bond suffered a graze wound on his back, which may have been caused by that same bullet's trajectory. A final shot entered his back right shoulder and injured his aorta, heart, liver, and lung. This shot was fatal. The bullet from the chest wound was recovered, as were fragments of the bullet from the thigh.

The jury convicted the Defendant of the lesser-included offense of criminally negligent homicide in the count charging the premeditated murder of Mr. Bond.[1] He was convicted of the felony murder of Mr. Bond and of two counts of attempted aggravated robbery as charged. The jury convicted the Defendant of the lesser-included offense of the attempted second degree murder of Ms. Goodrich. The Defendant was sentenced to life imprisonment for felony murder, four years for each attempted aggravated robbery conviction, and ten years for attempted second degree murder, all to be served concurrently.

The Defendant moved for a new trial, asserting that Ms. Goodrich's testimony was admitted in error and that the evidence was insufficient to uphold the verdict. The trial court denied the motion, and the Defendant appeals.

**ANALYSIS**

**I. Sufficiency of the Evidence**

The Defendant's challenge to the sufficiency of the evidence on appeal is premised on the assertion that the State failed to prove that the Defendant attempted to take any property from the victims. We agree with the State that, while the Defendant purports to challenge all of his convictions, he presents no argument that his attempted second degree murder or criminally negligent homicide convictions were not supported by the evidence introduced at trial, and he in fact concludes his argument by calling for the dismissal of only the attempted aggravated robbery convictions and the felony murder conviction premised upon attempted aggravated robbery. We proceed to address whether evidence was sufficient to support the conclusion that the Defendant committed attempted aggravated robbery against the victims.

---

[1] The record and judgment sheet do not reflect that this conviction was merged into the felony murder conviction. We remand for merger, which should be reflected on the judgment form.

This court must set aside a conviction if the evidence is insufficient to support the finding of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). A jury's verdict of guilt, approved by the trial court, resolves conflicts of evidence in the State's favor and accredits the testimony of the State's witnesses. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "This Court affords the State the strongest legitimate view of the evidence presented at trial and the reasonable and legitimate inferences that may be drawn from the evidence." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *Wagner*, 382 S.W.3d at 297.

The State charged the Defendant with criminal attempt to commit aggravated robbery. Tennessee Code Annotated section 39-12-101 delineates the requirements for a conviction for criminal attempt:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

T.C.A. § 39-12-101(a), (b).[2]

Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). Theft is accomplished if the accused, acting with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. *Id.* § 39-14-103(a). As pertinent here, robbery becomes aggravated when it is accomplished with a deadly weapon. *Id.* § 39-13-402(a).

The Defendant's argument basically amounts to the assertion that the Defendant's act of pointing a gun and demanding money is insufficient to convict him of the offense of attempted aggravated robbery without proof that he either completed the robbery or, presumably, made a physical "grab" for the victims' property. However, the Defendant's act of demanding money while pointing a gun at Ms. Goodrich is sufficient to convict him of attempted aggravated robbery. *See State v. Jurico Readus*, No. W2011-01544-CCA-R3-CD, 2013 WL 173744, at *6 (Tenn. Crim. App. Jan. 16, 2013); *State v. Webster*, 81 S.W.3d 244, 249 (Tenn. Crim. App. 2002) ("Accordingly, we find that the Defendant's conduct in approaching the victim and pointing a gun at the victim's head constituted a substantial step toward the commission of an especially aggravated robbery."). Furthermore, there was evidence that the Defendant, armed with a deadly weapon, also demanded money of Mr. Bond and that Mr. Bond's property, including his identification, telephone, and marijuana, was taken. The accident of fact that the household contained no money and nothing else of substantial value to take does not exculpate the Defendant of the crime of attempted aggravated robbery. A rational trier of fact could have found that the Defendant intended to commit aggravated robbery and that the act of demanding money while armed with a revolver was intended to cause the aggravated robbery to occur. Because the Defendant's challenge to his felony murder

---

[2] The instructions regarding attempted aggravated robbery charged the jury under subsection (a)(2). Both parties rely on subsection (a)(3) in their analysis on appeal, and instructions for attempt under subsection (a)(3) were also included in the general jury instruction form. We note that the jury instruction for attempted aggravated robbery required the jury to find both the use of a deadly weapon and serious bodily injury, in effect elevating the proof to that required for attempted especially aggravated robbery. The instructions are not at issue on appeal, and we observe that the contested issue at trial was the Defendant's identity. *See State v. Marcus Webb,* No. W2002-00614-CCA-R3-CD, 2003 WL 214451, at *4 (Tenn. Crim. App. Jan. 29, 2003) (concluding that the issue at trial was identity and not mens rea, and that result-of-conduct mens rea instruction was not prejudicial).

conviction is premised on the grounds that the State did not prove the elements of attempted aggravated robbery, we likewise reject that challenge. Accordingly, the evidence is sufficient to uphold the verdicts.

## II. Testimony from Preliminary Hearing

The Defendant argues that Ms. Goodrich's preliminary hearing testimony should have been excluded under Tennessee Rule of Evidence 804 and the Confrontation Clause of the United States and Tennessee Constitutions. *See* U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. The Defendant asserts that he did not have an adequate opportunity to cross-examine Ms. Goodrich about her statement regarding the tattoo. The State argues that the preliminary hearing testimony is admissible under the Tennessee Rules of Evidence and that there was no constitutional violation.

### A. Hearsay

A trial court's factual findings and credibility determinations regarding a ruling on hearsay are binding on the appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). This court determines de novo whether a statement qualifies as hearsay or is admissible under one of the hearsay exceptions. *Id.*

Hearsay is "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is, in general, not admissible. Tenn. R. Evid. 802. Hearsay may, however, be admissible in certain circumstances when the declarant is unavailable. *See* Tenn. R. Evid. 804. A witness who is deceased is unavailable under the Rule. Tenn. R. Evid. 804(a)(4). One type of hearsay from an unavailable witness permitted under the Rule is former testimony:

> (1) *Former Testimony.* Testimony given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination.

Tenn. R. Evid. 804(b)(1). "Accordingly, if a witness previously testified in another proceeding and the party whom the testimony is offered against had an opportunity to examine the witness and a similar motive to develop that witness' testimony, then that

testimony may be admitted in a subsequent proceeding if the witness is unavailable." *State v. Hood*, 338 S.W.3d 917, 923 (Tenn. Ct. App. 2009).

The Defendant argues that he did not have a similar motive or adequate opportunity to cross-examine Ms. Goodrich because he did not have access to her prior statement regarding the facial tattoo at the time of the preliminary hearing. However, "[c]omplete identity of the issues is not necessary" in order for a statement to be admissible under Rule 804. *State v. Howell*, 868 S.W.2d 238, 251 (Tenn. 1993). As long as the issues at the previous hearing are "sufficiently similar," the statement may be admissible. *Id.* Although a party may decide not to engage in rigorous or even *any* cross-examination, "'there is no unfairness in requiring the party against whom the testimony is now offered to accept [a] prior decision to develop or not develop the testimony fully.'" *Id.* at 252 (quoting *United States v. Salerno*, 505 U.S. 317, 329, n. 6 (1992) (Stevens, J., dissenting)) (emphasis omitted).

In a preliminary hearing, as at trial, the primary issue is whether or not the defendant committed the offense. *Howell*, 868 S.W.2d at 251; *State v. Brian Eric McGowen*, No. M2004-00109-CCA-R3-CD, 2005 WL 2008183, at *11 (Tenn. Crim. App. Aug. 18, 2005). The State here offered testimony from the preliminary hearing, and "[a] preliminary hearing transcript 'is precisely the type of former testimony contemplated under [Rule 804(b)(1) ].'" *State v. Bowman*, 327 S.W.3d 69, 88-89 (Tenn. Crim. App. 2009) (quoting *State v. Michael Dwayne Hatfield,* No. 03C01-9307-CR-00233, 1994 WL 102072, at *3 (Tenn. Crim. App. Mar. 29, 1994)). In fact, the Advisory Commission Comment to the Rule states that "[t]he rule covers … preliminary hearing transcripts." Tenn. R. Evid. 804(b)(1), Advisory Comm'n Cmt. Accordingly, this court has previously approved the admission of preliminary hearing testimony at trial. *Bowman*, 327 S.W.3d 69, 88-89; *Howell*, 868 S.W.2d at 251 (concluding that preliminary hearing transcript from a prior prosecution in a different state for a different murder was admissible because the defendant's identity as the killer was the issue in both cases); *Michael Dwayne Hatfield*, 1994 WL 102072, at *3 (preliminary hearing transcript from victim who died of unrelated causes before trial was admissible).

We further note that, when a statement which is hearsay has been admitted into evidence, the declarant's credibility may be attacked as if the declarant were testifying at the trial. Tenn. R. Evid. 806. For instance, "[e]vidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain." *Id.*; *see also Bowman*, 327 S.W.3d at 90 (concluding that admission of the hearsay statement of an unavailable witness could be impeached with hearsay under Rule 806). At trial, the Defendant was able to impeach Ms. Goodrich by introducing evidence regarding what amounted to an inconsistent statement, that the perpetrator had a facial

tattoo. While Ms. Goodrich was not cross-examined about this particular statement at the hearing, neither was she able at trial to explain or, in the prosecutor's terms, rehabilitate her testimony regarding the presence of a tattoo. The jury was presented with evidence that the Defendant did not have a facial tattoo and that the witness had told police he did. We conclude that Ms. Goodrich's testimony was properly admitted under Rule 804, and we note that her prior inconsistent statement was likewise properly admitted. The Defendant is not entitled to relief.

### B. Confrontation Clause

The Defendant also asserts he was denied his right to confront witnesses when Ms. Goodrich's testimony was admitted. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. We review the question of whether or not the Defendant's right to confrontation was violated de novo. *State v. Davis*, 466 S.W.3d 49, 68 (Tenn. 2015).

The United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him…." U.S. Const. amend. VI. The Tennessee Constitution likewise guarantees the accused the opportunity "to meet the witnesses face to face." Tenn. Const. art. I, § 9. The Confrontation Clause essentially ensures the right to physically face witnesses and the right to cross-examine witnesses. *State v. Lewis*, 235 S.W.3d 136, 142 (Tenn. 2007). The Tennessee Supreme Court has held that the protections provided by the Tennessee Constitution are co-extensive with the Confrontation Clause of the United States Constitution. *Davis*, 466 S.W.3d at 68.

The Confrontation Clause precludes the admission of testimonial statements from witnesses who are not present at trial unless the witness has been found to be unavailable and the defendant was provided with "a prior opportunity for cross-examination." *State v. Dotson*, 450 S.W.3d 1, 63 (Tenn. 2014) (citing *Crawford v. Washington*, 541 U.S. 36, 59 (2004)). The Confrontation Clause governs only testimonial hearsay, and it applies only to testimonial statements offered for the truth of the matter asserted. *Id.* at 63-64. Statements are testimonial when "'the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'" *Id.* at 64 (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)). The primary purpose is evaluated not from the subjective or actual intent of the persons involved but from the purpose reasonable participants would have had. *Id.* Whether a statement is testimonial is a threshold inquiry which determines whether the Confrontation Clause is implicated in the admission of evidence. *Lewis*, 235 S.W.3d at 142-43.

A preliminary hearing is intended "to determine whether there exists probable cause to believe that a crime has been committed and that the accused committed the

crime." *State v. Lee,* 693 S.W.2d 361, 363 (Tenn. Crim. App. 1985); *see State v. Edward Warren Wise*, No. M2012-02129-CCA-R3-CD, 2013 WL 4007787, at *5 (Tenn. Crim. App. Aug. 6, 2013). Testimony from a preliminary hearing is testimonial for the purposes of the Confrontation Clause. *Brian Eric McGowen*, 2005 WL 2008183, at *12 (citing *Crawford*, 541 U.S. at 58). Because the statements are testimonial, we proceed to analyze whether their admission violated the Confrontation Clause.

We note initially that "'the Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish….'" *Davis*, 466 S.W.3d at 68 (quoting *United States v. Owens*, 484 U.S. 554, 559-60 (1988)). Accordingly, this court has upheld the admission of testimony from a preliminary hearing when the defendant had an opportunity to cross-examine a witness who was subsequently deemed unavailable. *Edward Warren Wise*, 2013 WL 4007787, at *6 (concluding that preliminary hearing testimony was admissible because there was a similar motive to develop the testimony and because the defendant engaged in thorough cross-examination); *Bowman*, 327 S.W.3d at 89 (concluding that "preliminary hearing testimony was admissible under the 'former testimony' hearsay exception of Rule 804(b)(1) and … did not violate the defendant's rights under the Confrontation Clause."); *Brian Eric McGowen*, 2005 WL 2008183, at *12; *Howell*, 868 S.W.2d at 252 (concluding that because previous counsel at out-of-state preliminary hearing had "similar motive" to cross-examine a witness, the admission of the testimony did not violate the defendant's right to confront witnesses).

Likewise, this court has rejected the claim that cross-examination at the preliminary hearing was insufficient due to differences in the nature of the proceedings, including the burden of proof. *State v. Michael James Grubb*, No. E2005-01555-CCA-R3-CD, 2006 WL 1005136, at *5-7 (Tenn. Crim. App. Apr. 18, 2006) (rejecting claim that "the type of cross-examination conducted at a preliminary hearing is different from that conducted at trial"). In *State v. Robert Echols*, the defendant asserted that because discovery was not mandated and identification standards were more "'lax'" at the preliminary hearing, admission of the victim's testimony at trial violated his right to confront witnesses. No. W2013-02044-CCA-R3-CD, 2014 WL 6680669, at *13 (Tenn. Crim. App. Nov. 26, 2014). This court rejected the argument under a plain error analysis, concluding that the motive to cross-examine was similar and that the defendant's counsel in fact effectively challenged the victim's identification in various ways on cross-examination. *Id.* at *15; *see also State v. Brian Roberson*, No. E2013-00376-CCA-R3-CD, 2014 WL 1017143, at *7 (Tenn. Crim. App. Mar. 14, 2014) (rejecting argument that cross-examination at preliminary hearing was insufficient to meet the requirements of the Confrontation Clause).

- 11 -

In this case, the primary issue at the preliminary hearing was the same as the primary issue at trial: the identity of the Defendant as the perpetrator. Counsel for the Defendant cross-examined Ms. Goodrich regarding her location at the time of the crimes, whether she could see Mr. Bond or the perpetrators while they were in the living room, whether she was under the influence of drugs or alcohol, whether her mother was able to view the events, whether the lights were on, how far she was from the Defendant and whether she was facing him, what the Defendant was wearing, whether the Defendant had "gold … bridgework" or facial hair, what type of weapon the Defendant held, her prior relationship with the Defendant, whether she was able to view the second perpetrator, at what point she closed her eyes, other shootings which had occurred in the neighborhood, what she had told officers on the scene and at the hospital, and her identification of the Defendant in the photographic lineup. As noted above, her prior statement regarding the Defendant's facial tattoo was ultimately admitted into evidence at trial. We conclude that the Defendant had a similar motive and a prior opportunity to confront the witness, and accordingly we conclude that his right to confrontation was not violated.

The Defendant argues that the trial court's admission of the testimony should be reversed in any event because the trial court failed to follow mandatory procedure in admitting the evidence. The Defendant contends that the trial court made no explicit determination that the statement was testimonial or that the Defendant had an opportunity and motive to cross-examine the witness at the hearing. The Defendant cites to no case law regarding any mandatory procedure, and the trial court noted that the Defendant had had the opportunity to cross-examine the witness at the hearing and would have to "live with" the prior decisions regarding cross-examination. In any event, the Defendant conceded that the witness was unavailable, and our de novo review has determined that the statements were testimonial but that the Defendant had an opportunity and similar motive to cross-examine the witness at the preliminary hearing. The witness was effectively cross-examined regarding her identification of the Defendant, and the jury was permitted to consider the evidence of her prior inconsistent statement regarding the facial tattoo. While the prior cross-examination may not have been "'to whatever extent, the defense might wish….,'" the Defendant was presented with, and availed himself of, "an *opportunity* for effective cross-examination." *Davis*, 466 S.W.3d at 68 (quoting *Owens*, 484 U.S. at 559-60). The Defendant is not entitled to relief.

## CONCLUSION

Because the testimony from the preliminary hearing was properly admitted and because the evidence was sufficient to uphold the verdicts, we affirm the judgments of the trial court. We remand for the merger of the conviction for criminally negligent

homicide into the conviction for felony murder, with the merger to be reflected on the judgment form.

_____
JOHN EVERETT WILLIAMS, JUDGE